# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

09 CV 2269

| | | |
|---|---|---|
| THE KNIGHT SERVICES HOLDINGS LIMITED, ON BEHALF OF ITSELF and ALL OTHERS SIMILARLY SITUATED, | ) ) ) ) ) | CASE NO. |
| **Plaintiff,** | ) ) ) | |
| vs. | ) ) | CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS |
| FAIRFIELD SENTRY LIMITED, FAIRFIELD GREENWICH (BERMUDA) LTD., FAIRFIELD GREENWICH LIMITED, FAIRFIELD GREENWICH GROUP, PRICEWATERHOUSECOOPERS, JEFFREY H. TUCKER, CITCO FUND SERVICES [EUROPE] B.V. , CITCO GLOBAL CUSTODY N.V., ANDRES PIEDRAHITA, JAN NAESS, PETER P. SCHMID, AMIT VIJAYVERGIYA, and WALTER M. NOEL, JR., | ) ) ) ) ) ) ) ) ) ) ) ) ) | **JURY TRIAL DEMANDED** |
| **Defendants.** | | |

RECEIVED
MAR 11 2009
U.S.D.C. S.D.N.Y.
CASHIERS

Plaintiff, The Knight Services Holdings Limited ("Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, alleges upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia,* the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the public documents and announcements made by defendants, Securities and Exchange Commission ("SEC") filings, and press releases regarding Fairfield Sentry Limited ("Fairfield Sentry Limited" or the "Fund") as follows:

535868v3

## NATURE OF THE ACTION

1.       This is a class action on behalf of all persons, other than defendants, who acquired shares of Fairfield Sentry Limited during the period March 11, 2004, through and including December 10, 2008 (the "Class Period"), to recover damages caused by defendants' violation of the federal securities laws (the "Class"). This case arises from a massive, fraudulent scheme perpetrated by Bernard L. Madoff ("Madoff") through his investment firm, Bernard L. Madoff Investment Securities, LLC ("BMIS"), and others, and which was facilitated by defendants named herein. During the Class Period, the defendants issued to the investing public false and misleading financial statements and press releases concerning, among other things, the Fund's reported net asset value, the manner in which the Fund's assets were invested, the extent of the defendants' due diligence of Madoff and BMIS, and the true state of supervision and oversight over the Fund's assets.

2.       Defendants caused and permitted $7.3 billion of the Fund's total assets to be handed over to Madoff to be "invested" for the benefit of plaintiff. Plaintiff's investments with the Fund were decimated as a direct result of the fraud perpetrated by Madoff and BMIS and the complete failure of PricewaterhouseCoopers ("PWC") to perform adequate audits and create its annual audit reports in conformance with generally accepted auditing standards despite the existence of a myriad of "red flags" indicating a high risk to Fairfield Sentry from concentrating its investment exposure in Madoff.

3.       Throughout the Class Period, Madoff deceived investors by operating a securities business that traded and lost investor money, and then paid certain investors purported returns on investments with the principal received from different investors. In short, Madoff and his cohorts operated a massive "Ponzi" scheme the likes of which are unparalleled.

535868v3

4.     On December 10, 2008, Madoff informed certain senior BMIS employees (reported to be his sons) that BMIS' investment advisory business was an utter fraud. Madoff confessed that he was "finished," that he had "absolutely nothing," that "it's all just one big lie," and that it was "basically, a giant Ponzi scheme." Madoff communicated to the senior employees that for years he paid returns to certain investors out of the principal received from other, different investors. Madoff stated that the business was insolvent and that it had been for years. Madoff also stated that he estimated the losses from this fraud to be approximately $50 billion. Published reports now indicate that Madoff's estimate may be on the conservative end of the range once the full effect of the fraud is understood.

5.     On December 11, 2008, SEC and criminal charges were brought against Bernard Madoff. He was arrested and admitted to a Federal Bureau of Investigation Special Agent that "there is no innocent explanation" for BMIS' losses and that he "paid investors with money that wasn't there."

6.     One of Madoff's client's was defendant Fairfield Sentry Limited, which, unknown to Plaintiff and other class members, and notwithstanding assertions to the contrary, failed to monitor or supervise the investments made with Madoff and BMIS, and failed to perform adequate due diligence. Investors who entrusted their savings are now ruined. Indeed, scores of charities were destroyed and have either closed their doors or cancelled their proposed grants.

7.     Plaintiff seeks to recover damages caused to the Class by defendants' violation of Section 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

8.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §78j(b) and 78t(a) and the rules and regulations promulgated thereunder by the SEC, including Rule 10b-5, 17 C.F.R. §240.10b-5.

9.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. §78aa and 28 U.S.C. §1331.

10.    Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act as the defendants maintain offices in this District and many of the acts and practices complained of herein occurred in substantial part in this District.

11.    In connection with the acts, transactions and conduct alleged herein, defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including the United States mails, interstate telephone communications and the facilities of the national securities exchanges.

## THE PARTIES

12.    Plaintiff acquired shares of the Fund during the Class Period as per the annexed certificate and suffered economic damages that were caused by defendants' false and misleading statements.

13.    Defendant Fairfield Sentry Limited is organized as an international business company under the laws of the Territory of the British Virgin Islands. The registered office of the Fund is located in the British Virgin Islands.  Upon information and belief, the Fund maintains an office at 55 East 52nd Street, 33rd Floor, New York, New York, 10055.

535868v3

14.    Defendant Fairfield Greenwich (Bermuda) Ltd., ("FGBL") a corporation organized under the laws of Bermuda, serves as the Fund's investment manager. It is responsible for the management of the Fund's investment activities, the selection of the Fund's investments, monitoring its investments and maintaining the relationship between the Fund and its custodian, administrator, registrar and transfer agent. FGBL is a wholly-owned subsidiary of Fairfield Greenwich Limited which previously served as the investment manager of the Fund and currently serves as the Fund's Placement Agent. Effective April 20, 2006, FGBL registered as an investment adviser with the United States Securities and Exchange Commission pursuant to the Investment Advisers Act of 1940, as amended. Defendant FGBL's stated address is in Bermuda. Upon information and belief, FGBL also maintains an office at 55 East 52nd Street, 33rd Floor, New York, New York, 10055.

15.    Defendant Fairfield Greenwich Limited, ("FGL") incorporated under the laws of the Cayman Islands is the Fund's Placement Agent. FGL oversees the marketing of the Fund. FGL charged its clients a placement fee of up to 3% of the total amount of the subscription for Shares sold with its assistance. FGL received a monthly management fee, equal to approximately 1% per annum of the net asset value of the Fund. FGL was permitted to share this fee with FGBL and its affiliates. FGL also received a performance fee equal to 20% of the net profits, payable quarterly. FGL and FGBL are member companies of the Fairfield Greenwich Group. Jeffrey H. Tucker, Walter M. Noel, Jr. and Andres Piedrahita are the main principals of FGL. Upon information and belief, FGL maintains its principal office at 55 East 52nd Street, 33rd Floor, New York, New York, 10055.

16.    Defendant Fairfield Greenwich Group ("FGG"), which was established in 1983 and had, as of August 2008, approximately $16 billion in client and firm assets under

- 5 -

management, is a global family of companies with offices in New York, London, and Bermuda, representative offices in the U.S., Europe, and Asia, and a joint venture in Singapore. Fairfield Greenwich Group is the marketing name for the securities and investment advisory businesses of Fairfield Greenwich Limited and its subsidiaries worldwide. FGG markets its funds principally outside the U.S. to private banks, institutional investors, financial advisors, consultants, and high-net-worth individuals as well as tax-exempt U.S. entities. FGG had a 19 year ongoing relationship with Madoff. FGG maintains its principal offices at 55 East 52nd Street, 33rd Floor, New York, New York, 10055.

17.     Defendants FGG, FGL, and FGBL are collectively known as "Fairfield Greenwich."

18.     Defendant PricewaterhouseCoopers, LLP ("PWC") organized under the laws of Ontario, Canada, is a member of the PricewaterhouseCoopers global network, which consists of 155,000 employees in 150 countries providing auditing and accounting services to its clients. PWC received significant fees for auditing the Fund during the relevant time herein and providing annual audit reports to the Fund directors and shareholders. PWC affiliates performed similar auditing and accounting work for the Fund in prior periods.

19.     According to PWC's website, "PwC's Audit and Assurance Group provides assurance on the financial performance and operations of your business. We can also help your business improve its external financial reporting and adapt to new regulatory requirements such as Bill 198, Sarbanes-Oxley and International Financial Reporting Standards (IFRS). Our leading edge audit and review approach can also be tailored to meet the needs of any size organization as evidenced by our appointment as auditor and accountant to thousands of small - and mid-size

535868v3

businesses. In every case, the PwC audit is underpinned by our deep industry knowledge, wide international experience, and global network of skilled professionals."

20.   PWC has an office in Toronto, Canada and it maintains its U.S. headquarters at 300 Madison Avenue, New York, New York 10017.

21.   Defendant Jeffrey H. Tucker ("Tucker") is a founding partner of FGG and has been responsible for directing its business and operational development. He has been a director or general partner for a variety of its investment funds. Mr. Tucker is a principal in FGBL. Mr. Tucker resides in New York.

22.   Defendant Andres Piedrahita ("Piedrahita") is a director and president of FGBL. He is also a principal of FGL and is founding partner and Executive Committee member of FGG. Mr. Piedratha is also a son-in-law of defendant Walter M. Noel, Jr. Mr. Piedrahita maintains a residence in New York.

23.   Defendant Jan Naess ("Naess") is a director of the Fund. The Fund's Board of Directors has overall management responsibility for the Fund, including establishing investment, dividend and distribution policy, and having the authority to select and replace the Fund's administrator, registrar and transfer agent, custodian, any officers of the Fund and other persons or entities with management or administrative responsibilities to the Fund. As a director, he is paid a fee of $25,000 per annum by the Fund together with his out-of-pocket expenses in attending meetings of the Board of Directors or of shareholders. Mr. Naess maintains an office at 66 Field Point Road, Greenwich, Connecticut 06830-6473.

24.   Defendant Peter P. Schmid ("Schmid") is a director of the Fund. The Fund's Board of Directors has overall management responsibility for the Fund, including establishing investment, dividend and distribution policy, and having the authority to select and replace the

535868v3

Fund's administrator, registrar and transfer agent, custodian, any officers of the Fund and other persons or entities with management or administrative responsibilities to the Fund. As a director, he is paid a fee of $25,000 per annum by the Fund together with his out-of-pocket expenses in attending meetings of the Board of Directors or of shareholders. Mr. Schmid is a resident of Zurich, Switzerland.

25.     Defendant Amit Vijayvergiya ("Vijayvergiya") is the risk manager of the Fund. He is a Partner and the Chief Risk Officer of FGG and President of FGBL. Mr. Vijayvergiya is based in Bermuda but maintains an office at 55 East 52nd Street, 33rd Floor, New York, New York, 10055.

26.     Defendant Walter M. Noel, Jr. ("Noel") founded FGG in 1983. Since founding FGG, Mr. Noel has been a director or general partner for a variety of its funds. He is a principal of FGL and a director of the Fund. The Fund's Board of Directors has overall management responsibility for the Fund, including establishing investment, dividend and distribution policy, and having the authority to select and replace the Fund's administrator, registrar and transfer agent, custodian, any officers of the Fund and other persons or entities with management or administrative responsibilities to the Fund. Additionally, Mr. Noel is defendant Piedrahita's father-in-law. Defendant Noel maintains a residence in New York and an office at 55 East 52nd Street, 33rd Floor, New York, New York, 10055.

27.     Messrs. Tucker, Piedrahita, Naess, Schmid, Vijayvergiya and Noel, are sometimes referred to as the "Individual Defendants."

28.     Citco Fund Services [Europe] B.V. ("Citco Fund Services") is the administrator, registrar and transfer agent of the Fund. As the Fund's administrator, Citco Fund Services was responsible for the day to day administrative functions of the Fund including providing financial,

- 8 -

tax and compliance reporting; calculating the Net Asset Value and fees of the Fund; preparation of the statements and maintaining the Fund's books and records. According to its website, "Citco Fund Services companies offer a full range of fund administration services from 16 strategic centers globally. Our global presence reflects our philosophy to provide support wherever our clients are located. We also utilize this global reach to ensure specific client needs are met in a timely basis." Citco Fund Services received significant fees for administrating the Fund during the relevant time herein and providing Net Asset Value reports and statements to the Fund and shareholders. Citco Fund Services is located at Telestone 8- Teleport, Naritaweg 165, Amsterdam, The Netherlands. Citco Fund Services also maintains an office in this Judicial District at 350 Madison Avenue, 12th Floor, New York, New York, 10017.

29.     Citco Global Custody N.V. ("Citco Global") is the custodian of the Fund. The custodian is responsible for maintaining the Fund's assets, including cash and actual securities. According to its website, Citco Global "are the recognized world leaders in custody and fund trading for financial institutions and fund of funds, offering unrivaled expertise in the execution, settlement and custody of funds from strategic centers in The Netherlands, Switzerland, Curacao, Ireland, Canada, Luxembourg, the Bahamas, Cayman Islands and Italy."   Additionally, Citco Global states that its "custody services cover the entire trading, clearing, settlement and custody life-cycle: locating funds, placing subscriptions/redemptions, completing paperwork and registering funds, addressing corporate actions, providing online real-time statements of holdings and statements of transactions." Citco Global received significant fees for safeguarding the Fund's assets during the relevant time herein and providing reports to the Fund and shareholders. Citco Global is located at 6 Customs House Plaza, Harbourmaster Plaza, Dublin, Ireland.

535868v3

30.     Citco Fund Services and Citco Global (collectively, "Citco") are part of the Citco Group of Companies, a worldwide group of independent financial service providers serving the world's elite hedge funds, private equity and real estate firms, institutional banks, Global 1000 companies and high net worth individuals. Citco companies service these sectors around the world by offering hedge fund administration, custody and fund trading, financial products and corporate and trust planning solutions.

31.     Fairfield Greenwich and the Individual Defendants (collectively the "Controlling Defendants") by reason of their direct and substantial management positions and responsibilities during the time relevant to this Complaint, were "controlling persons" of the Fund within the meaning of Section 20 of the Exchange Act and had the power and influence to control the Fund and exercised such control to cause the Fund to engage in the violations and improper practices complained of herein. The Individual Defendants, because of their positions as officers and directors of the Fund and/or its investment manager and/or placement agent, had access to adverse non-public information about the Fund, its investments and operations. At all times during the Class Period, the controlling defendants had sufficient knowledge and authority to discover and correct the false representations and failed to do so.

32.     The Fund, Fairfield Greenwich, PWC, Citco and the Individual Defendants are collectively referred to as the "Defendants."

33.     The statements made by the Defendants as outlined below were materially false and misleading when made. The Defendants had no reasonable or adequate basis to justify or support or tout their split-strike conversion strategy, the performance of the Fund, the Net Asset Value calculations, the Fund's growth rate, the degree of supervision over Bernard Madoff and BMIS. The true financial and operating condition of the Fund, which was known or recklessly

535868v3

disregarded by the Defendants, remained concealed from the investing public. Defendants, who were under a duty to disclose those facts, instead misrepresented or concealed them during the relevant period herein.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

34.     Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of the Class. Excluded from the Class are Defendants, the officers and directors of the Fund at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns.

35.     The members of the Class are so numerous that joinder of all members is impracticable. During the Class Period, the Fund had purported assets exceeding $7 billion. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by the Fund and may be notified of the pendency of this action by mail using the form of notice similar to that customarily used in securities class actions.

36.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

37.     There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)     Whether Defendants violated the Exchange Act;

(b)     Whether Defendants omitted and/or misrepresented material facts;

- 11 -

535868v3

(c)    Whether Defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading; and

(d)    Whether Defendants knew or recklessly disregarded that their statements were false and misleading.

38.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

39.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## FALSE AND MISLEADING STATEMENTS

40.    On July 1, 2003, Defendants issued a private placement memorandum (the "2003 Offering Memorandum") offering redeemable, voting class B shares in Fairfield Sentry Limited.

41.    Pursuant to the 2003 Offering Memorandum, the minimum required investment was $100,000 and the shares were only available to, "persons who are neither citizens nor residents of the United States and to a limited number of United States investors consisting of pension and profit sharing trusts, charities and other tax-exempt entities."

42.    According to the 2003 Offering Memorandum, the business objective of the Fund was "to obtain capital appreciation of its assets principally through the utilization of a non-

535868v3

traditional options trading strategy described as 'split strike conversion', to which the Fund allocates the predominant portion of its assets."

43.    The 2003 Offering Memorandum described the split strike conversion strategy in relevant part:

> The Fund seeks to obtain capital appreciation of its assets principally through the utilization of a nontraditional options trading strategy described as "split strike conversion", to which the Fund allocates the predominant portion of its assets. This strategy has defined risk and profit parameters, which may be ascertained when a particular position is established. Set forth below is a description of the "split strike conversion" strategies ("SSC Investments").
>
> The establishment of a typical position entails (i) the purchase of a group or basket of equity securities that are intended to highly correlate to the S&P 100 Index, (ii) the sale of out-of-the-money S&P 100 Index call options in an equivalent contract value dollar amount to the basket of equity securities, and (iii) the purchase of an equivalent number of out-of-the-money S&P 100 Index put options. An index call option is out-of-the-money when its strike price is greater than the current price of the index; an index put option is out-of-the-money when the strike price is lower than the current price of the index. The basket typically consists of approximately 35 to 45 stocks in the S&P 100.
>
> The logic of this strategy is that once a long stock position has been established, selling a call against such long position will increase the standstill rate of return, while allowing upward movement to the short call strike price. The purchase of an out-of-the-money put, funded with part or all of the call premium, protects the equity position from downside risk.
>
> A bullish or bearish bias of the positions can be achieved by adjustment of the strike prices in the S&P 100 puts and calls. The further away the strike prices are from the price of the S&P 100, the more bullish the strategy.    However, the dollar value underlying the put options always approximates the value of the basket of stocks.

- 13 -

44.     Defendants' statements with regard to the Split Strike Conversion strategy was false and misleading when made, as it failed to disclose that the Fund simply turned over its assets to BMIS which failed to follow any strategy other than run a $50 billion Ponzi scheme.

45.     The 2003 Offering Memorandum also listed the following investment restrictions that the Fund would observe:

(a)     no more than 10% of the Net Asset Value of the Fund will be invested in the securities of any one issuer (other than any government or governmental agency);

(b)     the Fund may not hold more than 10% of the issued securities of any one class of securities in any issuer (other than any government or governmental agency);

(c)     no more than 10% of the gross assets of the Fund may be exposed to the creditworthiness or solvency of a single counterparty (other than any government or governmental agency), in each case calculated at the time of investment;

(d)     no more than 10% of the Net Asset Value of the Fund may be invested in securities of countries where immediate repatriation rights are not available;

(e)     the Fund will not invest in the securities of any issuer if the directors and officers of the Fund and the Investment Manager collectively own in excess of 5% of such securities;

(f)     the Fund will not take or seek to take legal or management control of the issuer of underlying investments;

(g)     the Fund will adhere to the general principle of diversification in respect of all of its assets;

(h)     the Fund will not invest directly in real property;

- 14 -

(i)     the Fund will not make any loans (except to the extent that the acquisition of any investment in securities or commodity interests described herein may constitute a loan) to any one issuer (other than any government or governmental agency) except with the consent of the custodian of the Fund's assets; and

(j)     no more that 10% of the Net Asset Value of the Fund will be invested in physical commodities

46.    This list of investment restrictions was false and misleading because the Fund, in actuality, did not supervise or monitor its investments, and it did not adhere to any of its investment restrictions but simply turned all of its assets over to Bernard Madoff and BMIS.

47.    According to the 2003 Offering Memorandum, Citco appointed BMIS as a sub-custodian for certain assets of the Fund.  The 2003 Offering Memorandum stated, "sub-custodians may be appointed by Citco provided that Citco shall exercise reasonable skill, care and diligence in the selection of a suitable sub-custodian and shall be responsible to the Fund for the duration of the sub-custody agreement for satisfying itself as to the ongoing suitability of the subcustodians to provide custodial services to the Fund.  Citco will also maintain an appropriate level of supervision over the sub-custodians and will make appropriate inquiries periodically to confirm that the obligations of the sub-custodians continue to be competently discharged.  Any sub-custodian appointed will be paid at normal commercial rates."

48.    This information was false and misleading as it failed to disclose that, in fact, Citco performed no oversight of BMIS whatsoever.  By turning over responsibility to safeguard the assets to BMIS, Citco was facilitating the fraud perpetrated by Madoff and BMIS.

49.    Every month, Citco sent a statement to investors detailing their holdings in the Fund and providing them with a calculation of their Net Asset Values.  Each of these statements

- 15 -

were false and misleading when made as Citco did not have any basis to characterize the Fund's performance or stock positions since the Fund, rather than following the split-strike conversion strategy it had touted to investors, was simply turning over all its assets to BMIS without any supervision or monitoring.

50.   On August 14, 2006, Defendants issued a private placement memorandum (the "2006 Offering Memorandum") offering redeemable, voting shares in Fairfield Sentry Limited.

51.   Pursuant to the 2006 Offering Memorandum, the minimum required investment was $100,000 and the shares were only available to, "persons who are neither citizens nor residents of the United States and to a limited number of United States investors consisting of pension and profit sharing trusts, charities and other tax-exempt entities." However, "following his initial investment, a shareholder may make additional investments in amounts of not less than U.S. $50,000."

52.   According to the 2006 Offering Memorandum, the business objective of the Fund was "to obtain capital appreciation of its assets principally through the utilization of a non-traditional options trading strategy described as 'split strike conversion', to which the Fund allocates the predominant portion of its assets."

53.   The 2006 Offering Memorandum further stated that, "the Split Strike Conversion strategy is implemented by Bernard L. Madoff Investment Securities LLC, a broker-dealer registered with the Securities and Exchange Commission, through accounts maintained by the Fund at that firm. The accounts are subject to certain guidelines which, among other things, impose limitations on the minimum number of stocks in the basket, the minimum market capitalization of the equities in the basket, the minimum correlation of the basket against the S&P 100 Index, and the permissible range of option strike prices. Subject to the guidelines,

- 16 -

BMIS is authorized to determine the price and timing of stock and option transactions in the account. The services of BMIS and its personnel are essential to the continued operation of the Fund, and its profitability, if any."

54.    Defendants' statements with regard to the Split Strike Conversion strategy and the existence of limitations on BMIS were false and misleading when made, as they failed to disclose that the Fund failed to perform on the most basic and simplistic due diligence with respect to BMIS that the only strategy BMIS was employing was a $50 billion Ponzi scheme.

55.    The 2006 Offering Memorandum also listed the following investment restrictions that the Fund would observe:

(k)    no more than 10% of the Net Asset Value of the Fund will be invested in the securities of any one issuer (other than any government or governmental agency);

(l)    the Fund may not hold more than 10% of the issued securities of any one class of securities in any issuer (other than any government or governmental agency);

(m)    no more than 10% of the gross assets of the Fund may be exposed to the creditworthiness or solvency of a single counterparty (other than any government or governmental agency), in each case calculated at the time of investment;

(n)    no more than 10% of the Net Asset Value of the Fund may be invested in securities of countries where immediate repatriation rights are not available;

(o)    the Fund will not invest in the securities of any issuer if the directors and officers of the Fund and the Investment Manager collectively own in excess of 5% of such securities;

(p)    the Fund will not take or seek to take legal or management control of the issuer of underlying investments;

(q)     the Fund will adhere to the general principle of diversification in respect of all of its assets;

(r)     the Fund will not invest directly in real property;

(s)     the Fund will not make any loans (except to the extent that the acquisition of any investment in securities or commodity interests described herein may constitute a loan) to any one issuer (other than any government or governmental agency) except with the consent of the custodian of the Fund's assets; and

(t)     no more that 10% of the Net Asset Value of the Fund will be invested in physical commodities

56.     This list of investment restrictions was false and misleading because the Fund, in actuality, did not supervise or monitor its investments, and it did not adhere to any of its investment restrictions but simply turned all of its assets over to Bernard Madoff and BMIS.

57.     The 2006 Offering Memorandum also stated that an affiliate of FGBL performs regular risk management services. The 2006 Offering Memorandum stated in pertinent part:

> An affiliate of FGBL, Fairfield Risk Services Ltd. ("FRS"), also a wholly owned subsidiary of FGL, shares office space with FGBL and serves as FGG's Risk Management team, which, as noted, includes FGBL. A Director of FGBL, Amit Vijayvergiya, serves both FGBL and FRS and manages both teams. FRS primarily conducts both the pre- and post-investment quantitative analyses of hedge fund managers, monitors the market risk and provides the quantitative analyses supporting the asset allocation decisions across the firm's multi-strategy funds. The risk infrastructure at FRS supporting these activities incorporates a number of systems and tools – including internally developed systems, off the shelf vendor solutions, and some customized applications built to meet FGG's business needs. An important component of the FGG product platform is the position level transparency that we receive from all single managers which are included in our multi-strategy funds. Position information is transmitted via secure channels to our systems. FRS's core risk management engine utilizes the flexible ASP version of the RiskManager product from

535868v3

RiskMetrics. This system is populated by detailed position information and further supplemented by an extensive market and terms and conditions database. The FRS team regularly evaluates the market risk of its single and multi-strategy funds by producing strategy and fund specific risk reports.   These reports are customizable to present risk measures and tests most appropriate to each portfolio's strategy.   The FRS team prepares a monthly suite of reports using RiskManager that are carefully reviewed and discussed by FGG's Investment Committee at a formal monthly risk meeting.     The reports organized along the following dimensions: Exposures, Sensitivities, Scenarios and Stress Tests, VaR, Correlations Analysis and Attribution Analysis. The review includes the full suite of VaR analytics (including marginal, incremental and relative VaR) and careful evaluation of the sensitivity of our managers to important risk factors (such as increasing or decreasing equity markets, volatilities, interest rate shocks/twists, FX movements and other factors).

Portfolios are reviewed at the individual security level from independent sources discussed among members of the FRS team, FGBL and Fairfield Greenwich Advisors LLC ("LGA") several times each month.   FRS, FGBL and FGA utilize a number of independent, sophisticated quantitative measurement tools to monitor the performance of its managers, compliance with investment guidelines, and risk analysis.   FRS, FGBL and FGA personnel review changes in a variety of factors, including changes in organization, investment process, the manager's view of the relevant markets, and their portfolio's position with respect to those views. The findings are discussed at regular meetings.

58.    This statement was false and misleading when made as Fairfield Greenwich had not properly vetted Madoff or BMIS.  If they had, they would have discovered the fraud that other investment managers discovered.

59.    The FGG website and brochure state in pertinent part:

Our investment philosophy requires that FGG Multi-Strategy funds, and the Single Manager funds of which they are composed, adhere to the following principles:

Full Transparency - To securities level, for FGG portfolio analysis and risk monitoring Transparency provides FGG the ability to ensure that portfolio managers are complying with strategy-specific investment limitations, and to better understand and

- 19 -

monitor changes in their investment behavior in changing markets, as well as to better construct our multi-strategy funds

\* \* \*

FGG accepts onto its platform only those managers who have passed through a far-reaching and rigorous selection and due diligence process. Monitoring and managing our carefully chosen and structured products is the ongoing duty of FGG's investment, risk, and operational professionals.

60.    The FGG brochure further has a section titled, "Due Diligence" which states in

pertinent part:

Once a manager has passed FGG's initial review phase, a more detailed investigation begins. The qualitative and quantitative reviews cover people, processes, portfolios and procedures. A number of areas of inquiry are examined by a team of FGG professionals who specialize in evaluating respective areas of risk. Analysis of portfolio composition, portfolio stress testing, risk management, asset verification, peer group comparison, operational and compliance procedures, information technology, and a review of offering documents and financial statements are among the areas of examination. This detailed due diligence phase is extremely labor intensive for both internal FGG resources and the external consultants we may retain to assist in a technical aspect of due diligence. Typically, a manager may be investigated and monitored for many months before that firm is accepted onto the FGG platform. A long analysis period reduces the risk of miscommunication and enables FGG to be more confident of its decisions before proceeding with a manager.

\* \* \*

FGG's due diligence process is deeper and broader than a typical fund of funds, resembling that of an asset management company acquiring another asset manager, rather than a passive investor entering a disposable investment.

\* \* \*

FGG thoroughly examines the abilities and personalities of the individuals involved in managing the fund through extensive interviews, as well as professional background investigations.

\* \* \*

535868v3

Once FGG begins a relationship with a manager and brings their fund to market, FGG's due diligence process evolves into a similarly multifaceted risk monitoring function.  FGG's deep, ongoing joint venture relationships, with its managers greatly facilitate communication and a continuing dialogue with managers, and thereby enhance the effectiveness of FGG's manager review process. Simply stated, the purpose of this ongoing activity is to ensure that the fund continues to follow its investment methodology – and constraints – and otherwise acts in accordance with the operational and risk framework that was approved during the due diligence phase.

Any divergences are discussed with the manager and addressed or resolved; on several occasions, the arrangement with a manager has been terminated as a result of findings arising from this ongoing review and analysis.  Independent information sources aid FGG's review of portfolios, and FGG discusses each portfolio with its portfolio manager each month.  FGG also utilizes a number of sophisticated third-party and internal quantitative measurement tools to monitor the performance of its managers.

61.     These statements were false and misleading when made because Defendants had abdicated all responsibility and oversight to Bernard Madoff and BMIS.  Defendants failed to conduct even the most rudimentary due diligence on Madoff and instead relied on the "reputation" of Madoff without conducting any investigation of the *bona fides* of Madoff and his operation, and/or an analysis of the trading strategies and investment returns reported by Madoff, which remained suspiciously and consistently high even during adverse market conditions.

62.     If Defendants had conducted even the simplest of due diligence analysis, they would have discovered what other investment advisors, who conducted due diligence on Madoff and ran simplistic models testing the validity of Madoff's results found:  the fraudulent irregularities evident in Madoff's investments.  For example, the financial press reported that Robert Rosenkranz of Acorn Partners, an investment advisor for high net individuals, conducted due diligence on Madoff and found it very likely that the BMIS account statements were generated as part of a fraudulent scheme.  Mr. Rosenkranz reached this conclusion based, *inter*

- 21 -

*alia*, on the abnormally stable and high investment returns claimed by **Madoff as well the** inconsistencies between customer account statements and the audited BMIS **financial statements** filed with the SEC.

63.   The financial press also reported that, prior to the disclosure of **the massive fraud** caused by Madoff, Simon Fludgate, head of operational due diligence at Aksia, **another advisory** firm, concluded that the stock holdings reported in the quarterly statements of BMIS filed with the SEC appeared too small to support the size of the assets Madoff claimed **to be managing.** The likely reason for this was revealed on December 15, 2008, when government **investigators** working at Madoff's offices determined that Madoff was operating a **secret, unregistered** investment vehicle from his office.

64.   On August 8, 2007, FGBL sent a semi-annual update letter on FGG letterhead to investors in the Fund touting the results of the Fund over the first six months of 2007.  The letter stated in pertinent part:

> Sentry's overall performance for the first six months of the year has been positive. It has delivered a net return of 4.00% year to date with positive performance generated in both quarters.
>
> * * *
>
> The majority of the Fund's positive performance of 4% in 2007 was driven by gains in the value of the stock basket which generated 2.41% in P&L. The options positions contributed 0.42% to net return with dividend income and interest income contributing 0.33% and 0.84% respectively.

65.   The information in the August 8, 2007 letter was false and misleading when made because FGBL had no basis to characterize the Fund's performance or stock positions since the Fund, rather than following the split-strike conversion strategy it had touted to investors, was simply turning over all its assets to BMIS without any supervision or monitoring.

- 22 -

66.    On April 7, 2008, the Fund issued to investors its Directors' report and financial statements for the years ended December 31, 2007 and 2006.  These documents contained the report of the independent auditor that was addressed to the directors and shareholders of the Fund and issued by PWC which stated in relevant part:

> In our opinion, the accompanying balance sheet and the related income statement, the statement of changes in net assets attributable to holders of redeemable participating shares and the cash flow statement present fairly, in all material respects, the financial position of Fairfield Sentry Limited (the "Company") as of December 31, 2007 and the results of its operations, the changes in its net assets attributable to holders of redeemable participating shares and its cash flows for the year then ended in conformity with International Financial Reporting Standards.  These financial statements are the responsibility of the Company's management; our responsibility is to express an opinion on these financial statements based on our audit.  We conducted our audit of these financial statements in accordance with auditing standards generally accepted in the United States of America.  Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement.  An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by the Company's management, and evaluating the overall financial statement presentation.  We believe that our audit provides a reasonable basis for our opinion.

67.    This auditor's report was false and misleading when made as PWC utterly failed to perform its work as auditors of the Fund's annual financial statements in a manner consistent with the standards of the auditing profession and as required by Generally Accepted Auditing Standards ("GAAS").

68.    Defendant PWC either knew of or recklessly disregarded: (a) the materially heightened risk to the Fund's assets from its reliance on Madoff, particularly given the lack of transparency of Madoff's operations; (b) the abnormally high and stable positive investment results reportedly obtained by Madoff, (c) the inconsistency between BMIS's publicly available

- 23 -

financial information concerning its assets and the purported amounts that Madoff managed for clients such as the Fund and; (d) the fact that BMIS itself was audited by a small, obscure accounting firm, Friehling & Horowitz, which has its offices in Rockland County, New York and had no experience auditing entities of the apparent size and complexity of BMIS.

69.     By failing to investigate these clear red flags and the suspicious nature of Madoff's operations and investment results, PWC's audits of the Fund's financial statements and reports thereon during the Class Period were grossly negligent, in violation of GAAS and constituted an extreme departure from the standards of the accounting and auditing industry. In particular, PWC has violated GAAS by failing to use due professional care in the performance of its work, AU §230; failing to properly plan the audits, AU §311; failing to maintain an appropriate degree of skepticism during the audits, AU §316; and failing to obtain sufficient competent evidential matter to support the conclusions of the audit reports, AU §326.

70.     If PWC had made an appropriate inquiry underlying these red flags, that investigation would have raised questions regarding the true value and existence of the Fund's reported investment assets and the serious deficiencies in the Fund's internal controls and adherence to its own policies designed to reduce the risk of loss to its shareholders.

71.     On August 8, 2008, FGBL sent a semi-annual update letter on FGG letterhead to investors in the Fund touting the results of the Fund over the first six months of 2008. The letter stated in pertinent part:

> Sentry's overall performance for the first six months of the year has been positive. Despite the turbulent environment of the first half of 2008, Sentry has performed well, delivering a net return of 2.58% for the six-month period ending June 30, 2008, with positive performance in both quarters.

72.     The information in the August 8, 2008 letter was false and misleading when made because FGBL had no basis to characterize the Fund's performance since the Fund, rather than

- 24 -

following the split-strike conversion strategy it had touted to investors, was simply turning over all its assets to BMIS without any supervision or monitoring.

73.     Besides the annual audits and semi-annual update letter, the Fund issued to investors a monthly "Risk Review" and separate monthly "Strategy Review" and Fund reports. Each of these reports were false and misleading because they failed to disclose that the Fund did not have any information on which to base its risk assessment and that the Fund, rather than following the split-strike conversion strategy it had touted to investors, was blindly turning over all its assets to BMIS without any supervision or monitoring.

## THE TRUTH IS REVEALED

74.     On December 11, 2008, agents of the FBI arrested Bernard Madoff and federal prosecutors charged him with perpetrating what may be the largest investor fraud ever committed by a single person.

75.     According to federal charges, Madoff said that his firm has "liabilities of approximately US$50 billion." Banks from outside the U.S. have announced that they have potentially lost billions in dollars as a result. Some investors, journalists and economists have questioned Madoff's statement that he alone is responsible for the large-scale operation, and investigators are looking to determine if there were others involved in the scheme.

76.     On December 22, 2008, the Fund sent a letter to shareholders which stated in pertinent part:

> Dear Shareholder,
>
> **Suspension of the Calculation of Net Asset Value**
>
> Reference is made to the extraordinary events of last week regarding Bernard L. Madoff Investments Securities LLC ("Madoff"). As you are most likely aware, on December 11, 2008 Bernard Madoff was arrested and charged with securities fraud for operating in essence a giant Ponzi scheme. It has been alleged that

535868v3

Madoff's fraud involved a loss in both cash and securities of possibly US$50 billion.

As you will have read in the press, Fairfield Sentry Limited (the "Company") was significantly exposed to Madoff. At this point in time the value of the Company's investment in Madoff is not certain. There may be residual assets in Madoff to be distributed or, alternatively, there may be no assets.

With the view to acting in the best interests of the Company and all of its shareholders and creditors, the Board of Directors of the Company (the "Board") has suspended the calculation of net asset value with a corresponding suspension of redemptions and subscriptions pursuant to Article 11(4) of the Articles of the Association of the Company, due to the fact that the Board determined (i) that circumstances exist as a result of which in their opinion it is not reasonably practicable for the Company to dispose of investments or that any such disposal would be materially prejudicial to shareholders, (ii) that a breakdown has occurred in the means normally employed in ascertaining the value of investments of the Company, (iii) that the value of the investments of the Company cannot reasonably or fairly be ascertained and (iv) that the Company is unable to repatriate funds required for the purpose of making payments due on redemption of shares. As such, pursuant to the powers contained in the Articles of Association of the Company, the Board has suspended the determination of the net asset value. As a result of such suspension, all subscriptions into and redemptions from the Company have been suspended. With respect to redemption requests received for the November 30, 2008 dealing date, the payment of these proceeds of redemption have been similarly suspended pursuant to the powers contained in the Articles of Association of the Company.

The Company has retained counsel in the British Virgin Islands and the United States to represent its interests. These counsel will advise as to what action should be taken to ensure the Company's interests in the remaining assets of Madoff are represented, to ensure an orderly running of the affairs of the Company and to ensure that all shareholders and creditors are treated equitably and fairly. In this regard and as advised by counsel, we are not able to respond to requests for information by individual shareholders at this time. Rather, information will be provided to all shareholders to ensure that no one shareholder is at an advantage. We note that the manager to the Company, Fairfield Greenwich (Bermuda) Limited, has waived all fees until further

- 26 -

535868v3

notice.  We will endeavour to keep you advised of developments with respect to the Company.

Yours faithfully,

The Board of Directors

77.    On these disclosures Plaintiff has suffered significant damages as result of Defendants' violations described herein.

## SCIENTER

78.    As alleged herein, Defendants acted with scienter in that Defendants, by and through their employee(s), knew or recklessly disregarded that the public documents and statements issued or disseminated in the name of the Fund were materially false and misleading; knew or recklessly disregarded that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

79.    By their concealment of the now revealed material facts, defendants were able to raise approximately $7.5 billion in the Fund and generate substantial fees for themselves.

80.    According to a December 19, 2008 article in the *Wall Street Journal*, FGL "charged clients larger fees than most similar firms do, including a 20% share of profits on investments, about double the norm for firms that farm out clients' money to a variety of fund managers."

## NO SAFE HARBOR

81.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking

statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of the Fund who knew that those statements were false when made.

## COUNT I
### Violation of Section 10(b) of the Exchange Act and
### Rule 10b-5 of the Securities and Exchange Commission
### (Against All Defendants)

82.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

83.     This Count is asserted against all Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5 promulgated thereunder.

84.     During the Class Period, Defendants directly engaged in a common plan, scheme, and unlawful course of conduct, pursuant to which they knowingly or recklessly engaged in acts, practices, and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class, and made various deceptive and untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading to Plaintiff and the other members of the Class. The purpose and effect of said scheme, plan, and unlawful course of conduct was,

- 28 -

535868v3

among other things, to induce Plaintiff and the other members of the Class to purchase shares in the Fund.

85.     During the Class Period, Defendants, pursuant to said scheme, plan, and unlawful course of conduct, knowingly and recklessly issued, caused to be issued, participated in the issuance of, the preparation and issuance of deceptive and materially false and misleading statements to Plaintiff and the other class members as particularized above.

86.     In ignorance of the false and misleading nature of the statements described above and the deceptive and manipulative devices and contrivances employed by said defendants, Plaintiff and the other members of the Class relied, to their detriment, on such misleading statements and omissions in purchasing limited partnerships in the Fund. Plaintiff and the other members of the Class have suffered substantial damages as a result of the wrongs alleged herein in an amount to be proved at trial.

87.     By reason of the foregoing, Defendants directly violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that it: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon plaintiffs and the other members of the Class in connection with their investments in the Fund.

## COUNT II
### For Violation of Section 20(a) of the Exchange Act
### (Against the Controlling Defendants)

88.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

- 29 -

89.    The Controlling Defendants acted as a controlling person of the Fund within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high level position, participation in and/or awareness of the Fund's operations, and/or intimate knowledge of the Fund's products, sales, accounting, plans and implementation thereof, they had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Fund, including the content and dissemination of the various statements that plaintiff contends are false and misleading. The Controlling Defendants had the ability to prevent the issuance of the statements or cause the statements to be corrected.

90.    The Controlling Defendants had direct and supervisory involvement in the day-to-day operations of the Fund and, therefore, are presumed to have had the power to control or influence the particular statements giving rise to the securities violations as alleged herein, and exercised the same.

91.    By virtue of their position as a controlling person, the Controlling Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of the wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their investments in the Fund.

## PRAYER

WHEREFORE, Plaintiff, on his own behalf and on behalf of the Class, prays for judgment as follows:

A.    Declaring this action to be a proper class action and certifying Plaintiff as class representative under Rule 23 of the Federal Rules of Civil Procedure;

B.    Awarding compensatory damages in favor of Plaintiff and the other members of the Class against the Defendants for the damages sustained as a result of the wrongdoings of the Defendants, together with interest thereon;

- 30 -

535868v3

C.     Awarding Plaintiff the fees and expenses incurred in this action, including reasonable allowance of fees for Plaintiff's attorneys, and experts;

D.     Granting extraordinary equitable and/or injunctive relief as permitted by law, equity and federal and state statutory provisions sued on hereunder, including attaching, impounding, imposing a constructive trust upon or otherwise restricting the proceeds of Defendants' trading activities or their other assets so as to assure that Plaintiff has an effective remedy; and

E.     Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED: March 11, 2009

WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLP

By: _____
Daniel W. Krasner
Gregory M. Nespole
Demet Basar (DB 6821)
Gustavo Bruckner
270 Madison Avenue
New York, New York 10016
Telephone: (212) 545-4600
Facsimile: (212) 545-4653

**Attorneys for Plaintiff**

535868v3

## PLAINTIFF'S CERTIFICATION

The **Knight Services Holdings Limited** ("Plaintiff") declares under penalty of perjury, as to the claims asserted under the federal securities laws, that:

1.     Plaintiff has reviewed the complaint and authorized the commencement of an action on Plaintiff's behalf.

2.     Plaintiff did not purchase the security or make the investment that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action.

3.     Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.     Plaintiff's investment(s) in Fairfield Sentry Ltd. during the Class Period specified in the Complaint are as follows:

**Contributions**

| Date | Amount |
| --- | --- |
| **April-01-2007** | **$ 500,000 (408.1116 shares)** |

5.     During the three years prior to the date of this Certificate, Plaintiff has not sought to serve or served as a representative party for a class in an action filed under the federal securities laws.

6.     Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 6th day of March, 2009.

_____
(signature)